This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Edwin Smith, appellant, appeals from the judgment of the Lorain County Court of Common Pleas. We affirm.
{¶ 2} On November 25, 2000, the Lorain Police Department responded to a report of an assault upon a victim, Michael Jackson. Mr. Jackson and his sister, Trina Jackson, indicated that Mr. Smith and another man had attacked Mr. Jackson near his truck which had been parked in front of Mr. Jackson's residence. On February 14, 2001, Mr. Smith was indicted on the charge of felonious assault, in violation of R.C. 2903.11(A)(2). Mr. Smith pled not guilty and entered a notice of alibi. The case proceeded to a jury trial, after which the jury found Mr. Smith guilty of the charge. On August 22, 2002, the trial court entered a judgment of guilty and sentenced Mr. Smith accordingly. This appeal followed.
{¶ 3} Mr. Smith raises two assignments of error. To facilitate review, we will address the second assignment of error first.
 Second Assignment of Error "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN UPHOLDING THE VERDICT OF GUILT FOR THE OFFENSE OF FELONIOUS ASSAULT." [sic.]
{¶ 4} In his second assignment of error, Mr. Smith asserts that his conviction for felonious assault was against the manifest weight of the evidence. We disagree.
{¶ 5} When determining whether a conviction was against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
{¶ 6} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
{¶ 7} Mr. Smith was found guilty of one count of felonious assault, in violation of R.C. 2903.11(A)(2). This statutory section provides:
"(A) No person shall knowingly do either of the following:
"(1) Cause serious physical harm to another or to another's unborn;
 "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
{¶ 8} R.C. 2901.22(B) defines the mental state of knowingly as "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." Physical harm means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C.2901.01(A)(3). In addition, deadly weapon includes "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). Mr. Smith does not contest the finding that the sticks used in the attack constituted a deadly weapon. He also does not contest that the injury at issue constituted physical harm. Rather, he asserts that the evidence clearly indicates that he had an alibi on the night of the offense, and also, that he was physically unable to commit the criminal act. Applying the foregoing to the facts of this case, we now turn to the evidence adduced at trial.
{¶ 9} Officer Melinda Senquiz-Reiber of the Lorain Police Department testified that, on November 25, 2000, she was dispatched at approximately 8:26 in the evening to Mr. Jackson's residence on Long Avenue in Lorain County. When she arrived, she observed a truck parked in front of the residence and spoke with Mr. Jackson who was bleeding heavily from his head. Ms. Jackson, Mr. Jackson's sister, was also at the residence. Before Mr. Jackson was taken away in an ambulance, he indicated that two men had attacked him and that, while one of the men wore a ski mask, he could identify the second man with certainty as Mr. Smith. Officer Senquiz-Reiber talked with Ms. Jackson who indicated that she had observed the attack from the front porch and could also identify the second attacker with certainty. The officer noted that there was a street light which enabled a person to see the street area near the truck from the porch of the residence.
{¶ 10} Mr. Jackson testified he knew Mr. Smith well and that Mr. Smith even lived in his residence with him for a period of time. He conceded that Mr. Smith eventually moved out of the residence because they no longer got along together. Mr. Jackson explained that, since Mr. Smith moved, they are no longer friends and that he personally did not like Mr. Smith anymore. On the day in question, Mr. Jackson had gone to the laundrymat and brought his laundry into his residence when he realized he had forgotten his compact disc case in his truck. As he was stepping out of the truck, he was struck on the back of the head. He turned around and saw Mr. Smith standing before him with a stick of some sort in his hand. Mr. Smith was wearing some type of hat but his face was clearly visible. According to Mr. Jackson, Mr. Smith swung the stick a second time, missing Mr. Jackson and hitting the truck. Mr. Jackson explained that he began to fight off Mr. Smith but was hit with another stick by a man wearing a ski mask. Mr. Jackson also explained that the sticks were large and had handles, comparing them to night sticks or batons used by police officers.
{¶ 11} Mr. Jackson testified that he fell to the ground, tried to move away, and pulled himself under the truck. At the same time, he began to scream to his sister in the residence for help. Mr. Jackson's legs were not covered by the truck and the two attackers continued to hit at his legs with the sticks. At some point, Mr. Smith reached under the truck and blindly swung the stick, shattering Mr. Jackson's "gum line." Thereafter, Ms. Jackson came out of the residence and the two men ran away. Mr. Jackson stated that he had an open-skull fracture, internal bleeding, an indent on his leg, lost part of his eyesight, and could not continue to work at his job as a result of the injuries. He also stated that, once he pressed charges, he had seen Mr. Smith act in a threatening manner toward him. Specifically, Mr. Smith tried to intimidate him by staring at him in a menacing way. Additionally, on one particular day, Mr. Smith followed Mr. Jackson in his vehicle throughout the City of Lorain. Mr. Jackson testified that he has kept police informed regarding Mr. Smith's threatening actions.
{¶ 12} Ms. Jackson testified that she knew Mr. Smith for approximately two to three years because he used to be her brother's friend. On the day in question, she was at Mr. Jackson's house. When he went out to the truck to retrieve his compact discs, she noted that he was gone for a long time. Ms. Jackson stated that, at some point, she heard a noise and went to the door. She heard her brother calling her name and, from the front door, saw two men beating on him with sticks. Mr. Jackson was halfway under his truck. Ms. Jackson could not recognize one of the men because he was wearing a ski mask. The other man was also wearing a ski mask but it was not pulled down over his face. Ms. Jackson indicated that she clearly recognized the second man as Mr. Smith. Thereafter, she ran to the phone to call 9-1-1 and the men ran down the street.
{¶ 13} Detective Edward Bermudez of the Lorain Police Department testified that he was assigned to Mr. Smith's case. He also testified that Mr. Jackson had indicated that he had known Mr. Smith for several years and that, according to Mr. Jackson, there were problems and hard feelings between Mr. Jackson and Mr. Smith. Detective Bermudez indicated that, in his investigation of Mr. Smith's alibi, he had talked to a woman named Sabbie Green in an attempt to confirm the story of Latoya Sims. Ms. Green had indicated to Detective Bermudez that, once Mr. Smith came to her house on the night in question, he never left her bedroom.
{¶ 14} Ms. Sims testified that she dates Mr. Smith and, on November 25, 2000, she picked up Mr. Smith to go to the mall. Initially, Ms. Sims stated that she picked up Mr. Smith between 6:00 to 6:30 in the evening, stayed at the mall between one to two hours, and dropped of Mr. Smith at Ms. Green's, the place where he was living, at 8:15. Thereafter, on cross-examination, Ms. Sims admitted that she did not really know any exact times but, rather, was stating approximations. Ms. Sims testified that Mr. Smith was in bad physical shape on the day in question. He had been attacked at a bar and had a stubbed toe, scraped knee, and a jammed right finger.
{¶ 15} Ms. Sims stated that, after she dropped off Mr. Smith, she went to pick up her brother or do something else on Long Street, the street where Mr. Jackson resided. She explained that this was the reason that police stopped her later that evening thinking that they had seen her car at Mr. Jackson's crime scene. Ms. Sims testified that she observed an ambulance at Mr. Jackson's residence so she went to her mother's home to listen to the family scanner. When she heard that police were looking for Mr. Smith, she went back to Ms. Green's home and, after Mr. Smith came outside of the apartment, warned him. Ms. Sims conceded that, as she testified in court, this was the first time she had told anyone this information.
{¶ 16} Ms. Green testified that Mr. Smith returned from the mall at 8:15 or 8:20 that night, got in bed with her, and did not leave the house again. Ms. Green stated that, at 9:00, she had left the apartment to have her hair braided. On cross-examination, she denied that she avoided telling the police that she left the apartment that night. She also denied telling the police that Ms. Sims had in fact not come to her apartment to warn Mr. Smith. Ms. Green testified that Mr. Smith was too injured physically to have been involved in the attack but conceded that he was well enough to walk around the mall. Ms. Green admitted that she did not tell the police that Mr. Smith was with her on the evening in question until approximately seven to eight months after the incident.
{¶ 17} Although Mr. Smith presented conflicting testimony, we refuse to overturn the verdict because the jury believed Mr. Jackson whose description of the events was consistent and was corroborated by other witnesses. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757. We find no indication that the trial court lost its way and committed a manifest miscarriage of justice in convicting Mr. Smith of felonious assault; therefore, we conclude that Mr. Smith's conviction on this count was not against the manifest weight of the evidence. Mr. Smith's second assignment of error is overruled.
 First Assignment of Error "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY REFUSING TO PERMIT APPELLANT TO INQUIRE AS TO THE MOTIVE OF THE WITNESSES FOR IDENTIFYING APPELLANT AS THE VICTIM'S ASSAILANT."
{¶ 18} In the first assignment of error, Mr. Smith asserts that the trial court erred in refusing to permit him to cross-examine Mr. Jackson regarding an alleged statement the victim had made to police that was contained in a police report.
{¶ 19} "The limitation of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." State v. Acre
(1983), 6 Ohio St.3d 140, 145. An abuse of discretion means more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Freeman v. Crown City Mining, Inc. (1993),90 Ohio App.3d 546, 552.
{¶ 20} In the present case, Mr. Smith was not permitted to cross-examine Mr. Jackson regarding a police report. After the state objected to Mr. Smith's line of questioning, Mr. Smith asserted that the police report indicated that Mr. Jackson claimed that Mr. Smith had been spreading rumors about him and that Mr. Jackson was worried that Mr. Smith would retaliate because Mr. Jackson had previously "beat up" Mr. Smith. It is unclear from the discussion held at trial at what point in time Mr. Jackson had made the statements or the context of Mr. Jackson's statements. The trial court sustained the objection. On appeal, Mr. Smith asserts that he should have been permitted to introduce the evidence pursuant to several evidentiary rules and that the evidence would have indicated that Mr. Jackson had a motive to be untruthful in identifying Mr. Smith as his attacker because he would want to have Mr. Smith put in prison out of fear of retaliation because the two men had a prior history and did not get along well together.
{¶ 21} This court finds that, even if it was error to not permit cross-examination on the matter at hand, the trial court's exclusion of the evidence in question did not prejudice Mr. Smith or affect his conviction. Evidence was introduced that Mr. Jackson may have had bias or other motives in testifying against Mr. Smith. Mr. Jackson admitted at trial that Mr. Smith moved out of their shared residence because they did not get along, that they were no longer friends, and that he did not like Mr. Smith. Detective Bermudez also testified that Mr. Jackson had indicated to him that there were both problems and hard feelings between Mr. Jackson and Mr. Smith. Mr. Smith was able to present fully his alibi defense at trial and, also, Mr. Smith's counsel had the opportunity to examine the defendant's witnesses and cross-examine the state's witnesses regarding any bias or ulterior motives. Moreover, we find that even if the excluded evidence had been admitted, it would not be sufficient to negate the proof of Mr. Smith's guilt. See State v. Williams (1983),6 Ohio St.3d 281, paragraph six of the syllabus. Since the exclusion of this evidence did not prejudice Mr. Smith, any error would be harmless. Crim.R. 52(A).
{¶ 22} Mr. Smith's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
SLABY, P.J. and WHITMORE, J. CONCUR.